**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**CONNIE L. CLARKE,**

                                        **Plaintiff,**

        **vs.**                                                   **1:10-CV-399**
                                                                **(MAD/ATB)**

**COUNTY OF BROOME, BROOME COUNTY**
**SHERIFF'S DEPARTMENT, DAVID HARDER,**
**Broome County Sheriff, in his official capacity,**
**and MARK SMOLINSKY, Individually and in**
**his Official Capacity as Broome County Deputy**
**Sheriff, DIANA BENOIT, Individually, State**
**of New York Employee at the Cairo Police**
**Barracks,**

                                        **Defendants.**
_____

**APPEARANCES:**                                          **OF COUNSEL:**

OFFICE OF RONALD R. BENJAMIN                 Ronald R. Benjamin, Esq.
P.O. Box 607
126 Riverside Drive
Binghamton, New York 13902
_Attorney for Plaintiff_

BROOME COUNTY ATTORNEYS' OFFICE            Aaron J. Marcus, Esq.
Edwin L. Crawford County Office Building
P.O. Box 1766
Binghamton, New York 13902
_Attorney for Defendants_
_County of Broome, Broome County Sheriff's_
_Department, David Harder and Mark Smolinsky_

NEW YORK STATE ATTORNEY GENERAL            James Seaman, Esq.
The Capitol
Albany, New York 12224
_Attorney for Defendant_
_Diana Benoit_

**Mae A. D'Agostino, U.S. District Judge:**

**MEMORANDUM-DECISION AND ORDER**

**INTRODUCTION**

Plaintiff Connie L. Clarke ("Clarke" or "plaintiff") commenced the within action pursuant to 42 U.S.C. § 1983 and New York State law.  Plaintiff's claims stem from an incident that occurred at plaintiff's home on April 5, 2009.  The amended complaint includes claims under the Fourth Amendment to the United States Constitution and state law causes of action for false imprisonment, intentional and negligent infliction of emotional distress, slander and negligent supervision.  Presently before the Court are defendants' motions (Dkt. Nos. 29 and 30) pursuant to Fed. R. Civ. P. 56 seeking summary judgment and dismissal of plaintiff's amended complaint. Plaintiff has opposed the motions but has voluntarily abandoned her claims against defendants Broome County Sheriff's Department and David Harder. (Dkt. No. 31).

**FACTS AND BACKGROUND**[1]

Plaintiff resides at 4 Wiley Swamp Court, Athens, New York, Unit 1067 in Greene County.  Plaintiff is the natural mother of Kaitlin Clarke ("Kaitlin"), born on July 31, 1991.  In January 2008, Kaitlin became pregnant.  At the time, Kaitlin was while living with plaintiff in Greene County.  For a short period of time, while she was pregnant, Kaitlin stayed with plaintiff's sister, Christine and plaintiff's brother-in-law/Christine's husband, defendant Mark Smolinksy ("Smolinsky") in Berkshire, New York.[2]  Kaitlin later relocated to Binghamton where she resided at a Catholic Charities residence.

_____

[1] The background set forth in this section is taken from: (1) defendants' Statements of Material Facts and plaintiff's responses therein; (2) the exhibits and evidence submitted by defendants in support of the motions for summary judgment; and (3) the exhibits and evidence submitted by plaintiff in opposition to the motions for summary judgment.  To the extent that the "facts" are supported by the record, the Court will consider them in the context of the within motion.  The facts recited are for the relevant time period as referenced in the complaint however, there are few undisputed facts.

[2] Smolinsky is employed by the Broome County Sheriff's Department.

2

On September 2008, Kaitlin gave birth to a daughter, H.C.[3], at Binghamton General Hospital.  From the time H.C. was born until mid-March 2009, Kaitlin and H.C. stayed, on an alternating basis, at plaintiff's residence in Greene County and at the Catholic Charities residence in Binghamton.  In early March 2009, Kaitlin was forced to move out of the Catholic Charities residence and went to stay with her older sister, Candace, in Binghamton.  Shortly thereafter, plaintiff received a telephone call from Kaitlin asking plaintiff to travel to Binghamton and pick up H.C.   When plaintiff arrived, Kaitlin asked her to keep H.C. while Kaitlin checked herself into a facility for counseling or rehabilitation or "whatever she needed".  On or around March 17, 2009, plaintiff drove back to her Athens residence with H.C.

A few weeks later, while H.C. was still in plaintiff's care, plaintiff received a telephone call from Tonya Dannibale, a Broome County Child Protective Services ("CPS") caseworker. Ms. Dannibale stated that Kaitlin was deemed an "unfit parent" and that CPS would take custody of H.C. unless plaintiff agreed to serve as Kaitlin's security, or safety plan.  As Kaitlin's safety plan, plaintiff understood that she would need to care for H.C.

Plaintiff testified that on or around March 26, 2009, she received a threatening voicemail from Kaitlin.  On March 27, 2009, plaintiff sought an Order of Protection against Kaitlin and obtained paperwork for filing a petition for Temporary and Immediate Order of Protection in Greene County Family Court.  Plaintiff subsequently learned that she needed to file her petition in Broome County, not Greene County.  Sometime between March 27, 2009 and March 31, 2009, plaintiff went to Broome County and also learned that she needed a court order to obtain legal custody of H.C.  On March 31, 2009, plaintiff filed a Petition for "Emergency Temporary" Custody of H.C.  On or around that time, plaintiff claims that Christine called her and said that

---

[3] In light of the fact that the individual is a minor, the Court will refer to her as "H.C."

3

Christine and Smolinsky knew that plaintiff was in Broome County Family Court with H.C. Plaintiff claims that Christine told her that plaintiff's paperwork was faxed to Smolinsky.[4]  On April 1, 2009, the Broome County Family Court sent plaintiff a "Notice to Appear in Court" which scheduled an initial appearance regarding the custody petition for April 15, 2009.

The parties present diverging accounts of the events that occurred between April 1, 2009 and April 6, 2009.  However, the record establishes that an emotionally charged custody dispute began.  On April 2, 2009, the matter was referred to the State Police barracks in Catskill, New York and assigned to Trooper Nicole Dellarocco for investigation.  On the same day, Trooper Dellarocco went to plaintiff's home and was allowed inside by Greg Torti ("Torti"), plaintiff's fiancee.  Dellarocco explained that she received a complaint regarding H.C. and asked plaintiff to return the child.  Plaintiff refused and showed Dellarocco a copy of the paperwork she filed in Greene and Broome County including the Broome County Family Court custody petition.  Trooper Dellarocco reviewed the paperwork and called CPS.  The caseworker told Trooper Dellarocco that plaintiff's temporary order was valid.  After speaking with the caseworker, Trooper Dellarocco left H.C. with plaintiff and left the premises.

On April 2, 2009, Trooper Dellarocco prepared a report.[5]   In the Narrative section, she stated:

> 1.    Kaitlin Clark called to report her mother, Connie Clark, had her six month old daughter and refused to give her back.

---

[4] Smolinsky claims that he did not receive copies of any Family Court documents other than a copy of plaintiff's filed petition.

[5] The report is not in proper evidentiary form.  However, the report was annexed to defendant's motion papers and plaintiff's opposition papers.  Thus, as the parties do not object to the admissibility of the document, the Court will consider the report in the context of the within motion.

4

    2.      Interviewed Connie Clark who states she has temporary custody of the child while the matter is pending in both Greene and Broom[e] County's.

    3.      Reviewed all paperwork stating same and conferred with on-call CPS worker who stated the temporary order is valid.

    4.      Re-contacted Kaitlin Clark advised of same and that she is expected to be in Family Court on April 13, 2009 at 10:30 a.m.

On April 3, 2009, Kaitlin filed a petition in Broome County Family Court seeking custody of her daughter. Plaintiff was named as a respondent in the petition. Smolinksy claims that K.C. called him after she was in court. On the same day, Kaitlin contacted the police. Kaitlin claims she called the Binghamton and Coxsachie police because, "my mother was saying she had custody, even though they had found out there was no custody order, and I believed I was the only one entitled to have custody of my own daughter". Kaitlin claims she called to inquire as to whether her mother's conduct amounted to kidnaping. On April 3, 2009, an officer from City of Binghamton Police Department prepared an Incident Write-Up.[6] The complainant was Kaitlin Clarke. The report provided:

> Clarke stated she has a question regarding the custody of her daughter H.C. Kaitlin advised she let her mother take custody of H.C. a few weeks ago, and now her mother is stating she has gained temp. custody of H.C. through a court in Coxsachie, NY, which is in Upstate NY, Clarke stated. Kaitlin wanted to know how this was possible. I advised Kaitlin that she needs to follow up with the family court in Coxsachie along with the P.D. where her mother and daughter are living currently to gain the current status of the situation. Kaitlin stated she is trying to find a place to live and is staying at random friends homes.

---

[6] The report was prepared by PR. R. Wood. The report contains hearsay and is not in proper evidentiary form. The report was provided by plaintiff's counsel as an exhibit on the within motion. Plaintiff's counsel avers, "[c]ounsel for defendants have consented to plaintiff's request [to have the report consider as part of the motion for summary judgment]". Therefore, the Court will consider the report in its analysis of the issues herein.

On April 4, 2009, Smolinsky contacted the Department of Social Services for Broome County and spoke with Kate Bednar, a caseworker.  Smolinsky advised her that Kaitlin wanted her child back.  Soon thereafter, Kaitlin called Smolinsky to tell him that she spoke with the caseworker who told Kaitlin that she should wait to speak with the caseworker assigned to the matter, Tonya Dannibale.  Kaitlin did not want to wait until Monday to speak with Ms. Dannibale and told the caseworker that "she wanted something done that day".  Kaitlin also told the caseworker that she and H.C. could stay with her aunt, Christine and Smolinsky.  Shortly thereafter, Smolinksy received a call from the caseworker who asked if Smolinsky would be a resource for H.C. and he confirmed that he would.[7]

On April 5, 2009 (Sunday), defendant Diana Benoit ("Benoit")[8] received a telephone call regarding this custody dispute.  Benoit claims that she was contacted by both Smolinsky and K.C.  Smolinsky told her that Kaitlin was living at his residence and that plaintiff was refusing to return Kaitlin's child.  Smolinsky asserts that he explained to Benoit that he spoke with a trooper a few days earlier who informed him that plaintiff had an order of protection but that he had been told by someone at CPS that plaintiff did not have a custody order.  Smolinsky claims that both he and Kaitlin asked Benoit to go to plaintiff's home to see if plaintiff would voluntarily turn H.C. over that evening.  Benoit confirms that she spoke with Smolinsky.

After speaking with Smolinsky, Investigator Benoit reviewed Trooper Dellarocco's April 2, 2009 report.  Benoit claims that she then spoke with Kaitlin over the telephone who told her that she wanted her child back.  Benoit claims that she attempted to call plaintiff but was unable to reach anyone at the phone number on Dellarocco's report.  Benoit and a uniformed trooper,

---

[7] These conversations are supported by CPS' sealed records.

[8] Benoit became a state trooper in 1990 and an investigator in 1997.  As part of her duties, she investigates crimes against children and cases involving custodial interference.

Dave Lane (deceased) drove to plaintiff's home.  Torti saw the trooper and Benoit approach the house and invited them into the kitchen through the sliding glass doors.   When plaintiff came downstairs, she saw Benoit and the trooper standing near the doors.  Benoit did not search the house or "check it out" but remained in the back corner of the kitchen.  Benoit did not pull her gun or threaten to do so and did not order plaintiff to "freeze".  Benoit did not touch plaintiff at any time.

Plaintiff testified that Benoit repeatedly threatened plaintiff and told plaintiff that if she did not return the child, Benoit would arrest plaintiff.  Benoit disputes this account of the events and claims that she, "may have said something to the effect that if there is no custody order and the mother asserts her custodial rights, plaintiff could get arrested for custodial interference".  Plaintiff handed Benoit the same documents that she had shown to Trooper Dellarocco.  Benoit claims that plaintiff had an application for a family court hearing, but not a custody order.  Benoit responded that the paperwork did not entitle plaintiff to legal custody.  While Benoit and Trooper Lane were at her home, plaintiff called her attorney.  Plaintiff put the telephone on speaker phone so that Benoit could hear her attorney.  Plaintiff's attorney told Benoit to leave if she did not have a warrant.  Plaintiff's attorney "screamed" at Benoit "over and over to leave".  Shortly thereafter, Benoit and Trooper Lane left.  Benoit claims that she called Smolinksy and told him that plaintiff "went ballistic" and refused to surrender the child.

The next day, April 6, 2009, plaintiff made several telephone calls in an effort to avoid having to return H.C. to Kaitlin.  Plaintiff testified that on April 6, 2009, she had a telephone conversation with Ms. Dannibale.  Ms. Dannibale told plaintiff that Kaitlin revised her safety plan to designate Smolinsky and that CPS made a mistake with the paperwork.  Plaintiff claims that

Ms. Dannibale told her that if she did not turn H.C. over, that plaintiff could be arrested.  On April 6, 2009, Torti drove plaintiff and H.C. to the Catskill station.

On April 6, 2009, Benoit after contacting the Greene County District Attorney, Benoit made arrangements to transfer the child by first contacting Kaitlin and Smolinsky to see when they could be at the Catskill station and then calling CPS.  Smolinsky claims that he took K.C. to Broome County Family Court to file additional papers.  Smolinsky claims that, "soon thereafter, Kaitlin and I were again in touch with Inv. Benoit" and as a result, Smolinsky drove Kaitlin to the barracks.  Benoit met Torti in the foyer and took H.C.  Benoit then went to a conference room and gave H.C. to Kaitlin.

On April 9, 2009, plaintiff withdrew her custody petition.  As a result, Kaitlin's petitions were rendered "moot" and she maintained custody of H.C.  On April 14, 2009, the petitions were dismissed.  On April 22, 2009, the Broome County Department of Social Services Child Protective Services generated a report and determined that Kaitlin made an appropriate safety plan to reside with her aunt and uncle in Tioga County.  The plan was approved by the department and the case was "closed".

On August 25, 2011, plaintiff filed an amended complaint in the within action.  Defendant Benoit moves for summary judgment and dismissal: (1) of plaintiff's Fourth Amendment claims; (2) dismissal of plaintiff's Fourth Amendment claims based upon qualified immunity; and (3) of plaintiff's state law claims.  In the alternative, defendant also argues that the Court should decline to exercise jurisdiction of plaintiff's state law claims if the federal cause of action is dismissed.  Defendants County of Broome and Smolinsky move for summary judgment and dismissal: (1) of plaintiff's claims against the individual defendants in their official capacities; (2) of plaintiff's Fourth Amendment claims; (3) of plaintiff's Fourth Amendment claims on the basis of qualified

immunity; (4) of plaintiff's *Monell* claims; and (5) of plaintiff's state law causes of action. Plaintiff has opposed both motions.

**DISCUSSION**

**I. Standard on Motion for Summary Judgment**

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56 ( c ). Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law. *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 258 (1986). A party moving for summary judgment bears the initial burden of demonstrating that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the Court, viewing the evidence in the light most favorable to the nonmovant, determines that the movant has satisfied this burden, the burden then shifts to the nonmovant to adduce evidence establishing the existence of a disputed issue of material fact requiring a trial. *See id.* If the nonmovant fails to carry this burden, summary judgment is appropriate. *See id.*

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is only appropriate where admissible evidence in the form of affidavits, deposition transcripts, or other documentation demonstrates the absence of a genuine issue of material fact, and one party's entitlement to judgment as a matter of law. *See Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir.1994). No genuinely triable factual issue exists when the moving party demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, that no rational jury could find in the

non-movant's favor. *Chertkova v. Conn. Gen'l Life Ins. Co.*, 92 F .3d 81, 86 (2d Cir.1996) (citing Fed.R.Civ.P. 56 ( c ).

In applying this standard, the court should not weigh evidence or assess the credibility of witnesses. *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996) (citation omitted).  These determinations are within the sole province of the jury. *Id.*

### A.    Kaitlin Clarke's Affidavits

Within this context, the Court must first address certain evidence submitted by defendants County of Broome and Smolinksy and plaintiff.  In support of their motion for summary judgment, the County of Broome and Smolinsky provided the Affidavit of Kaitlin C. Clarke dated April 7, 2011.  In that affidavit, Kaitlin makes various assertions regarding the events.  That affidavit was filed with the Court on October 27, 2011.  On November 23, 2011, plaintiff filed her opposition to defendants' motions and attached, as an exhibit, the Supplemental Affidavit of Kaitlin C. Clarke dated November 23, 2011.

Affidavits that conflict with prior sworn statements have to be disregarded. *Mulhern v. Eastman Kodak Co.*, 191 F.Supp.2d 326 (W.D.N.Y. 2002).  The Court must disregard factual claims made if those claims contradict statements made previously at a deposition, in an affidavit, and in response to defendants' interrogatories. *Reisner v. Gen. Motors Corp.*, 671 F.2d 91, 93 (2d Cir. 1982).  Contradictory affidavits preclude summary judgment only if the prior affidavits reflect confusion on the part of the affiant, and the subsequent affidavits explain why the earlier affidavits contain conflicting statements. *Hottinger v. Contel of Arkansas, Inc.*, 1995 WL 492892, at *2 (8th Cir. 1995).

In her Supplemental Affidavit, Kaitlin asserts, "I previously signed an affidavit in this matter on April 7, 2011, that I understand is before this Court on a motion by the defendants to

dismiss the case, and the purpose of this affidavit is to clarify certain dates and events that I set forth in that affidavit".   The November 2011 was clearly not prepared by Kaitlin as it contains handwritten notes in the margin and the initials "K.C." where lines have been drawn through sentences and phrases. In the Supplemental Affidavit, Kaitlin made significant substantive changes to her prior affidavit and failed to adequately explain the discrepancies.   The Court has thoroughly reviewed Kaitlin's affidavits and finds the documents unreliable.   As such, the Court will not accept Kaitlin's affidavits to the extent that her assertions are contradicted by the record. *See Horton v. Am. Railcar Indus., Inc.*, 214 F.Supp.2d 921, 930 (E.D.Ark. 2002).

## II.      Plaintiff's Claims against Smolinsky in his Official Capacity[9]

The Eleventh Amendment protects a state against suits brought in federal court by citizens of that state, regardless of the nature of the relief sought.  *Alabama v. Pugh*, 438 U.S. 781, 78 (1978).  A suit against a state official in his or her official capacity is a suit against the entity that employs the official.  *Farid v. Smith*, 850 F.2d 917, 921 (2d Cir.1988) (citing *Edelman v. Jordan*, 415 U.S. 651, 663 (1974)).  *Collazo v. Pagano*, 2009 WL 3030143, at *5 (N.D.N.Y. 2009)  "To the extent that a state official is sued for damages in his official capacity . . . the official is entitled to invoke the Eleventh Amendment immunity belonging to the state."  *Hafer v. Melo*, 502 U.S. 21, 25 (1991); *Kentucky v. Graham*, 473 U.S. 159, 166-67 (1985).

Plaintiff has named Smolinsky as a defendant in his official capacity and seeks monetary damages against defendant for acts occurring within the scope of his duties with the Broome County Sheriff's Department. Thus, the Eleventh Amendment bar applies and serves to prohibit plaintiff's claim for monetary damages against defendant.  Accordingly, this portion of Smolinsky's motion is granted.

_____

[9] Plaintiff has not asserted a cause of action against Benoit in her official capacity.

### III.     Plaintiff's Fourth Amendment Claims against Benoit

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . ."  U.S. Const. amend. IV.  The Fourth Amendment prohibits "police seizures of persons for custodial interrogation-even brief detentions falling short of arrest-without probable cause." *Cerrone v. Brown*, 246 F.3d 194, 199 (2d Cir. 2001).  The protections of the Fourth Amendment are limited to rights violated through unreasonable searches and seizures.  *See County of Sacramento v. Lewis,* 118 S.Ct. 1708, 1715 (1998).  "[E]ven unreasonable, unjustified, or outrageous conduct by an officer is not prohibited by the Fourth Amendment if it does not involve a seizure . . . or . . . a search." *Dick v. Gainer*, 1998 WL 894649, at *2 (7th Cir. 1998).  In order for a seizure to occur, the subject must "yield" to the assertion of authority over him and thereby have his liberty restrained.  *Britton v. Maloney*, 196 F.3d 24, 30 (1st Cir. 1999) (citing *California v. Hodari D.*, 499 U.S. 621, 626 (1991)).  If there is a show of authority without use of physical force, there can be no seizure unless there is also "actual submission" to the show of authority.  *Hodari D.*, 499 U.S. at 626 n. 2. To determine whether an encounter constitutes a seizure, "a court must consider the totality of the circumstances and ascertain whether the police conduct would have communicated to a reasonable person that she was free to terminate the encounter."  *Saenz v. Lucas*, 2008 WL 2735867, at *3 (S.D.N.Y. 2008) (citing *inter alia U.S. v. Glover*, 957 F.2d 1004, 1008 (2d Cir. 1992)).  Factors suggesting that a seizure has occurred include: the threatening presence of police officers; the display of a weapon; physical contact by the officer; language indicating that compliance with the officer is compulsory; prolonged retention of a person's belongings; and a request by an officer to accompany him or her to the police station or a police room.  *Gardiner v. Inc. Vill. of Endicott*, 50 F.3d 151, 155 (2d Cir. 1995).

12

If, as in this matter, the encounter with the police occurs in the plaintiff's home, the Court must determine whether a reasonable person in the plaintiff's position would have felt that she was free to disregard the office and leave her home without consequence. *Wray v. Painter*, 2010 WL 889984, at *2 (E.D. Pa. 2010) (the plaintiff was cornered in her home by three officers and threatened with arrest if she did not return a dog). While a seizure may occur regardless of whether the plaintiff was actually taken into custody, *see id.*, the mere threat of an arrest, without more, does not give rise to a seizure under the Fourth Amendment. *Bodek v. Bunis*, 2007 WL 1526423, at *9 (W.D.N.Y. 2007). In situations involving the threat of an arrest, "[t]he crucial test if whether, taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business". *Id.* (citing *Florida v. Bostick*, 501 U.S. 429, 437 (1991) ("In cases where the in the plaintiff's freedom of movement is restricted by a factor independent of police conduct, the appropriate inquiry is whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter.")); *see also U.S. v. Lee*, 916 F.2d 814, 819 (2d Cir. 1980).

In a case with analogous facts, the District Court in Massachusetts dismissed the plaintiff's Fourth Amendment claims upon a finding that no seizure occurred. In *Brown v. Sweeney*, 526 F.Supp.2d 126 (D. Mass. 2007), the defendant/officer appeared at the plaintiff's workplace and threatened to arrest the plaintiff if the plaintiff did not allow the officer to impound his car. The plaintiff refused and offered to show the officer documents proving that he had title to the car. *Id.* The officer agreed to examine the documents and went to the plaintiff's home with the plaintiff. After the defendant reviewed the documents, he left without arresting the plaintiff or impounding the vehicle. *Id.* The court held that, "[the officer's] 'show of authority' never

13

resulted in the 'intentional acquisition or physical control' over the subject and caused a 'termination of [his] freedom of movement'". *Id*. Thus, the plaintiff's Fourth Amendment rights were not implicated.

Here, defendant argues that there was no unreasonable seizure in violation of plaintiff's Fourth Amendment rights. Specifically, defendant contends that plaintiff ignored Benoit's alleged threats and Benoit left the premises without arresting plaintiff and without the child.[10] Plaintiff argues that "other circumstances" distinguish this case from *Brown*. The parties have presented an emotional and exhaustive history of the custody dispute involving H.C. While the acrimony between the family members is unfortunate, it is largely irrelevant to the issues presented by Benoit's motion. The movant and plaintiff present drastically conflicting accounts of the circumstances surrounding Benoit's presence in plaintiff's home, however, the Court views the evidence, as it must, in a light most favorable to plaintiff.

Plaintiff claims that Benoit's presence was threatening and that her tone and language indicated to plaintiff that compliance with the officer was compulsory. Plaintiff claims that Benoit's threats were relentless, loud and aggressive and occurred inside plaintiff's home over a lengthy period of time. Plaintiff testified that Benoit repeatedly told her, at least ten to fifteen times, that she was going to be arrested for kidnaping and that plaintiff would go to jail. Plaintiff also testified that Benoit threatened to tell people that plaintiff was crazy. Plaintiff contends that while Benoit was at her home, plaintiff called CPS and spoke with a "supervisor". The supervisor was willing to speak with Benoit but Benoit refused to speak with the caseworker. Plaintiff also contends that Benoit refused to review plaintiff's court documents. Plaintiff claims that Benoit

---

[10] Defendant also argues that plaintiff's home was properly searched because Benoit had consent to enter the home and moreover, exigent circumstances justified Benoit's entry. Plaintiff does not dispute that Benoit's entry into her home was unlawful. Plaintiff indicates that she "does not pursue a 'search' claim and, therefore, Benoit's arguments regarding consent are not addressed". (Dkt. No. 31, p. 6, n. 2).

was at her home between 30 and 60 minutes and only left because plaintiff's attorney directed Benoit to leave and return with a warrant. Finally, plaintiff argues that Benoit's threatening behavior continued into the next day resulting in plaintiff being forced to bring H.C. to the barracks.

Torti confirms plaintiff's description of Benoit's demeanor and testified that Benoit was a bully acting very aggressive and intimidating. He describes Benoit as "bad cop" claiming that she was very contentious with plaintiff repeatedly accusing plaintiff of "kidnaping". Torti did not testify that Benoit threatened to arrest plaintiff that evening. Rather, Torti stated:

> Q. And then she threatened her. She said Connie, we can do this the easy way or the hard way. You can give me the child tonight and to the effect it'll be done or I can come back tomorrow with paperwork, take the child. Because after Connie said, you know, like your standard line, do you have a warrant to come in. She said do you have a warrant -- do you have paperwork to take the child, she said, no. I can do this the easy way or the hard way. Give me the child tonight or I can come back tomorrow, I'll take the child and I'll arrest you. Blatant. And it's like, you know, we're not lawyers. We don't know. And if I know -- I wish I did know because I felt a little inept there. I mean she's rattling her gun and I'm like can she do that.

Benoit claims that explained to plaintiff that the child's mother complained that plaintiff would not return the child. Benoit alleges that she reviewed plaintiff's papers but found no custody order and told plaintiff that she needed a court order. Benoit claims that she went outside and spoke to the Greene County Sheriff's Department but was unable to verify whether a custody order existed. Benoit disputes plaintiff's claims that she threatened her and explained that she may have "said something to the effect that if there is no custody order and the mother asserts her custodial rights, plaintiff could get arrested for custodial interference". Benoit also contends that

any such threat would have been empty because kidnaping would not have been a proper charge since plaintiff did not abduct the child.

Despite the conflicting versions of events, the significant facts, for the purposes of an analysis of the Fourth Amendment, are undisputed.  Benoit did not order plaintiff to "freeze" and never displayed her weapon or threatened to display her weapon.  Benoit did not move around the house but stayed in the corner of the kitchen.  Benoit did not touch plaintiff.  Benoit did not retain any of plaintiff's belongings for any period of time and Benoit did not ask plaintiff to accompany her to the police station.  It is undisputed from the record that Benoit left plaintiff's home without H.C. and without arresting plaintiff.  Thus, there is no evidence of a Fourth Amendment seizure on April 5, 2009.  *See Palmieri v. Town of Babylon*, 2008 WL 3155153, at *14 (E.D.N.Y. 2008) (the officers never acted on any instruction or direction to arrest the plaintiff and the plaintiff left the building without being arrested).

With regard to plaintiff's claim that H.C. was actually "seized" the next day, the sequence of events between Benoit's visit and the when plaintiff appeared at the barracks to return H.C. belies plaintiff's claims.  While plaintiff states that she was "forced" to turn over H.C. on April 6, 2009, there is no evidence that any threat or action by Benoit caused her to do so.  Plaintiff testified:

> Q.   On the 5th or 6th, we had agreed earlier, that is the day that you and, I guess, Greg drove to the police barracks and turned over H.C.?
>
> A.   The 6th.
>
> Q.   The 6th?
>
> A.   Yes.
>
> Q.   How did that come about?

16

> A. Because I was on the phone with Tonya. I was on the phone with Tonya, and, basically, Tonya, at that point told me they had made a mistake, the paperwork they should have completed was not done and she was new, she screwed up, and that Kaitlin has now revised her safety plan, and that if I did not go, based on what she was told - - okay, again, kind of hearsay, what she was told is if I didn't take H.C. back, I was subject to arrest.
>
> Q. Okay.
>
> A. And we also called the police barracks at the State Police Barracks in Cairo, and were advised of the exact same thing, if we did not go and meet Mark and Kaitlin at the police station, I would be arrested.

Pltf. Dep. at p. 154.

> Q. Okay. And I have to ask you the question, I know it gets tedious, do you know who you talked to at the State Police?
>
> A. I don't recall at this point, but I'm sure it's in the notes.

*Id.* at p. 161.

Plaintiff could not provide any details regarding the arrangements to meet Smolinsky and Kaitlin at the barracks because Greg handled all of the issues and participated in the conversations with the state police. Torti testified that "someone" told plaintiff that they had a 3:00 p.m. deadline to return the child. However, Torti could not testify who plaintiff spoke to. Torti then called a "dispatcher" at the barracks but could not recall the dispatcher's name. Benoit claims that she did not speak with Torti on the telephone. Based upon plaintiff's own testimony, plaintiff had no further contact with Benoit after she left plaintiff's home on the evening of April 5th. Thus, any perceived threats to arrest plaintiff on April 6th did not come from Benoit.

Plaintiff relies heavily upon the decision from the Eastern District in *Bennett v. Town of Riverhead*, 940 F.Supp. 481 (E.D.N.Y. 1996) and the *Wray* decision from the Eastern District of Pennsylvania arguing that these cases support her argument that there are issues of fact

precluding summary judgment.  The *Bennett* case involved a custody dispute between the plaintiff

and her ex-husband which culminated in an incident between the plaintiff and the

defendant/police officer (Peeker) at the plaintiff's home.  The plaintiff's ex-husband sought the

assistance of the Riverhead Police Department in securing custody of his daughter.  Peeker

accompanied the plaintiff's ex-husband to the plaintiff's home.  The plaintiff invited the officer

into her home to explain her refusal of visitation and provided the officer with court documents.

The parties disputed all of the remaining facts.  The plaintiff provided an affidavit on the motion

claiming that the officer read the documents but stated that her ex-husband was still entitled to

visitation and that it was "his job to enforce the divorce judgment".  *Id*. at 486.  The plaintiff

claimed that a police officer (Peeker) threatened to arrest her claiming she was in violation of the

visitation provisions of a divorce decree.  *Id*.  The plaintiff told the officer that she would rather

be arrested than allow her ex-husband to take the child and asked if she could call a friend to care

for the child.  The officer denied the request and advised that if he arrested the plaintiff, he would

then take the child to her father.  *Id*. The officer removed the child from the home but did not

arrest the plaintiff.  The plaintiff's ex-husband did not return the child to the plaintiff for four

weeks.  *Bennett*, 940 F.Supp. at 486.  The plaintiff alleged that the threat of the arrest violated her

Fourth Amendment rights as she was coerced into giving up custody of her child against her

wishes.  *Id*.  The defendant claimed that he did not threaten the plaintiff with arrest but examined

the Court documents and warned the plaintiff of the consequences if she did not release the child

to the father.  *Id*.  The defendant claimed that the plaintiff consented to the release and that the

child (eight years of age) had no objection to leaving with her father.

The defendant moved for summary judgment.  The Court held that, "the conflicting

versions of events in [the plaintiff's] home leave material issues of fact in dispute".  *Id*. at 488.

Noting that the encounter occurred in the plaintiff's home, the Court concluded that "a reasonable person in [the plaintiff's] position could not have ignored Peeker and gone about her business. Her only options were to hand over the child or to be arrested, ignoring Peeker's threat of arrest was impossible". *Id.* The Court also found that the defendant's claim that the he merely informed the plaintiff of the risks associated with disobeying the visitation decree was in direct conflict with the plaintiff's version of events. This conflict precluded an award of summary judgment. *Id*.

The Court has thoroughly reviewed the *Bennett* decision and while factually, the case is somewhat similar to the case at hand, there is one significant difference. In this matter, plaintiff was able to and actually ignored Benoit's alleged threats to arrest her. In response to plaintiff's defiance, Benoit left the premises without H.C. and without arresting plaintiff.

Plaintiff also cites to *Wray* as support for her position. However, *Wray* is both procedurally and factually inapposite. The *Wray* case involved a motion to dismiss, not a motion for summary judgment. The defendant/officer initially confronted the plaintiff at her workplace and told her that he had a warrant for her arrest in connection with dog theft. The defendant later appeared at the plaintiff's house with two other officers. The plaintiff attempted to show the defendant evidence demonstrating her lawful possession of the dog. The defendant insisted that the plaintiff turn over the dog or be placed under arrest pursuant to an arrest warrant. However, the defendant refused to provide the plaintiff with a copy of the arrest warrant. Fearing that she would face arrest, the plaintiff turned over the dog. The plaintiff later learned that the officer did not have a warrant. The Court held that the plaintiff was "seized" within the meaning of the Fourth Amendment because a reasonable person in the plaintiff's position would not have felt she was free to disregard the defendant and leave her home without consequence. The Court

reasoned, "the plaintiff was cornered in her home by three officers", that the defendant lacked an arrest warrant, gained entry into the plaintiff's home through deception, and consciously ignored the plaintiff's attempts to explain the situation and provide evidence legitimizing her possession of the dog. Accordingly, the Court found that there was sufficient evidence for a factfinder to conclude that the defendant's conduct was unreasonable.

While Wray provides some guidance, as in Bennett, there are significant factual difference. Here, Benoit did not gain entry into plaintiff's home by deception. Rather, the parties agree that Torti invited Benoit into the home. Moreover, there is no evidence that plaintiff was "cornered" in her home and plaintiff was aware, upon Benoit's arrival, that Benoit did not have an arrest warrant. Again, the most striking dissimilarity is the fact that plaintiff ignored Benoit's threats and did not turn H.C. over and was not arrested.

Even accepting plaintiff's version of the relevant facts as true, there is no evidence that plaintiff or H.C. were "seized" resulting in a violation of plaintiff's Fourth Amendment rights by Benoit. If plaintiff's and Torti's version of the events is believed, Benoit's demeanor and actions at plaintiff's home are troubling and unprofessional and while the Court does not condone Benoit's behavior, it did not result in any constitutional violation to plaintiff. Accordingly, the Court grants summary judgment on this issue and dismisses plaintiff's First Cause of Action against Benoit.

**IV.   Plaintiff's § 1983 Claims against Smolinsky**

Section 1983 imposes civil liability upon persons who, acting under color of state law, deprive an individual of rights, privileges, or immunities secured by the Constitution and laws. *See* 42 U.S.C. § 1983. On its own, § 1983 does not provide a source of substantive rights, but rather, a method for vindicating federal rights conferred elsewhere in the federal statutes and

Constitution.  *Graham v. Connor*, 490 U.S. 386 (1989).  To establish a constitutional violation under § 1983, plaintiff must demonstrate that (1) defendants were acting under color of state law at the time of the alleged malicious prosecution; and (2) the action was a deprivation of a constitutional or federal statutory right.  *Washington v. County of Rockland*, 373 F.3d 310, 315 (2d Cir. 2004).

Plaintiff's § 1983 claim against Smolinsky is based upon the Fourth Amendment.  As discussed in Part III, plaintiff has failed to establish that she was "seized" or that she suffered a Fourth Amendment violation.  Accordingly, without a deprivation of a constitutional right, plaintiff cannot establish a § 1983 claim against Smolinsky.

Even assuming plaintiff could prove that she sustained a constitutional violation, in order to survive summary judgment she still must establish that Smolinsky was "acting under the color of state law".  For the purposes of § 1983 actions, "under 'color' of law means under 'pretense' of law" and that "acts of officers in the ambit of their personal pursuits are plainly excluded." *Caracciola v. City of New York*, 1999 WL 144481, at *9 (S.D.N.Y. 1999) (citing *Screws v. U.S.*, 325 U.S. 91, 111 (1945)); *Bonsignore v. City of New York*, 683 F.2d 635, 638–39 (2d Cir.1982) (a person acts under the color of state law when his actions are committed in the performance of any actual or pretended duty, and are not committed solely within the ambit of personal pursuits).  Under the "joint action" doctrine, a private actor can be found "to act 'under color of' state law for § 1983 purposes . . . [if the private party] is a willful participant in joint action with the state or its agents." *Dennis v. Sparks*, 449 U.S. 24, 27 (1980).  "To establish joint action, a plaintiff must show that the private citizen and the state official shared a common unlawful goal; the true state actor and the jointly acting private party must agree to deprive the plaintiff of rights guaranteed by federal law." *Anilao v. Spota*, 774 F.Supp.2d 457, 498 (E.D.N.Y. 2011).  "The

touchstone of joint action is often a plan, prearrangement, conspiracy, custom, or policy shared by the private actor and the [state actor]."  *Missere v. Gross*, 2011 WL 6030665, at *16 (S.D.N.Y. 2011).  "Communications between a private and a state actor, without facts supporting a concerted effort or plan between the parties, are insufficient to make a private party a state actor." *Fisk v. Letterman*, 401 F.Supp.2d 362, 377 (S.D.N.Y. 2005). This is especially true in cases involving private parties who seek assistance from police officers.  *See Ginsberg v. Healey Car & Truck Leasing, Inc*., 189 F.3d 268, 272 (2d Cir.1999).  In such cases, "a private party . . . does not become a state actor unless the police were influenced in their choice of procedure or were under the control of the private party."  *See Porter-McWilliams v. Anderson,*  2007 WL 4276801, at *7 (S.D.N.Y. 2007) (the plaintiff only alleged that the defendants provided detective and the court with information but the plaintiff alleged no facts suggesting that the detective was influenced in his choice of procedure or was under the control of the defendants when he filed a criminal charge against the plaintiff).  "The provision of information to, or the summoning of, police officers is not sufficient to constitute joint action with state actors for purposes of § 1983, even if the information provided is false or results in the officers taking affirmative action".  *Id*. (citations omitted); *see also Moore v. Marketplace Rest., Inc.*, 754 F.2d 1336, 1352 (7th Cir.1985) ("there must be some evidence of some concerted effort or plan between the private party . . . and the state official . . ."). Moreover, if evidence establishes that the officials exercised independent judgment and did not act at the private party's direction, the private party will not be deemed a state actor.  *Shapiro v. City of Glen Cove*, 236 F. App'x 645, 647 (2d Cir. 2007).

Conclusory allegations that the private actor undertook joint activity with the police are insufficient to state such a claim.  *Valez v. City of New York*, 2008 WL 5329974, at *3 (S.D.N.Y. 2008) (the complaint alleged that the police arrested Valez "on orders of plaintiff's landlord," that

the police "failed to properly investigate the [landlords'] claims," and that the "defendants conspired among themselves to deprive plaintiff of his constitutional rights."); *see also Doe v. Smith*, 704 F.Supp. 1177, 1188 (S.D.N.Y. 1988) (conclusory allegations or naked assertions are insufficient to plead joint or conspiratorial action between a state actor and a private defendant) (citing *Phillips v. Mashburn*, 746 F.2d 782, 785 (11th Cir.1984)).  Supporting operative facts must be alleged, the pleadings must specifically present facts tending to show agreement and concerted action.  *Doe*, 704 F.Supp at 1188 (citing *Sooner Products Co. v. McBride*, 708 F.2d 510, 512 (10th Cir.1983)).  To establish § 1983 liability based upon an alleged conspiracy with a public official, then, there must be some evidence, circumstantial or direct, upon which the jury could infer that the private party and the state actor had a "meeting of the minds" and thus reached an understanding that the plaintiff should be deprived of some right.  *D'Agostino v. New York State Liquor Auth.,* 913 F.Supp. 757, 770 (W.D.N.Y. 1996) (citing *Adickes*, 398 U.S. at 158). "[T]he Supreme Court [has] stressed that the fact to be alleged and proved [i]s that 'the [private and state actors] had a 'meeting of the minds' and thus reached an understanding " to deprive the plaintiff of his rights. *Id*. (citing *Annunziato v. The Gan, Inc*., 744 F.2d 244, 250 (2d Cir.1984)).

In support of the motion, Benoit and Smolinsky provided consistent affidavits in this regard.   Benoit claims that she did not know Smolinsky or any of the other parties involved in this dispute before April 5, 2009.  Benoit averred that her investigation was not influenced by Smolinsky.  Benoit explained that Kaitlin told her that plaintiff refused to return the trial and upon review, Benoit found Trooper Dellarocco's report "insufficient" because no temporary custody order existed.  Smolinsky claims that he did not contact Trooper Dellarocco and never met or spoke to Benoit prior to April 5, 2009.  Smolinsky further claims that he did not suggest that

Benoit handle the investigation in a certain manner.  Smolinsky has never worked for any type of investigation in Greene County or Coxsachie, New York and while plaintiff claims that Smolinksy had family court documents faxed to him, Smolinsky denies this allegation. Defendant argues that he was "off duty" when the events took place and that the actions he took on behalf of Kaitlin were "personal pursuits".  Defendant claims that he reported his niece's allegations to the New York State Police in Catskill, New York and that he has no connection to that department.

In opposition to the motion, plaintiff has provided only conclusory allegations.  Plaintiff argues, without support, that Smolinsky obtained confidential court documents and began to conduct his own investigation.  Plaintiff also claims that defendant contacted Trooper Dellarocco and initiated the investigation.  However, Trooper Dellarocco's report clearly indicates that Kaitlin was the complainant and she specifically "re-contacted" Kaitlin to report her conclusion.[11] Even assuming Smolinsky contacted Dellarocco, there is no evidence that Smolinsky influenced Dellarocco's investigation or that Smolinsky were engaged in a concerted effort and undertook a joint action to deprive plaintiff of any rights.

Plaintiff also alleges that Benoit did not call CPS or seek a warrant but decided to take the long drive to plaintiff's house when there was no evidence that H.C. was in danger.  Thus, plaintiff contends Benoit's actions raise "a strong presumption that Smolinsky influenced Benoit".  Plaintiff cannot defeat a motion for summary judgment with "presumptions".  The evidence does not established that Benoit was under Smolinsky's control or that the parties had a "meeting of the minds" and intended to deprive plaintiff of her rights.   Benoit and Smolinsky deny any prior contact or relationship before April 5, 2009.  Plaintiff has not come forward with

---

[11] The record does not contain an affidavit from Trooper Dellarocco.

any proof of a pre-arranged plan, conspiracy or policy sufficient to deem Smolinsky a "state actor".

While the Court is mindful not to engage in a credibility analysis on a motion for summary judgment, plaintiff cannot create an issue of fact sufficient to warrant a denial of summary judgment with mere conclusory assertions. There is no evidence, direct or circumstantial, of "joint action" between Smolinsky and Dellarocco/Benoit in pursuit of a common goal to deprive plaintiff of her constitutional rights. As plaintiff has failed to establish that she suffered any constitutional violation or further, that Smolinsky was a acting "under color of state law", the Court grants Smolinsky's motion for summary judgment on this issue.

## V.     Qualified Immunity

Defendants' arguments with respect to qualified immunity are moot based upon the Court's decision in Parts III and IV *supra*.

## VI.    *Monell* Claims

Plaintiff asserted a cause of action against County of Broome on a theory of municipal liability. Defendant moved for summary judgment and dismissal of this cause of action arguing that plaintiff has not shown a municipal policy or custom caused her injuries and further, that the municipality is not liable for actions of Smolinsky.[12]

A municipality is liable for deprivation of a citizen's rights pursuant to 42 U.S.C. § 1983 when execution of a government's policy or custom inflicts the injury. *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). There can be no claim against a municipality under *Monell* if there is no underlying liability for a constitutional violation against individuals. *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986). Courts have held, in "very special

---

[12] Plaintiff did not present any argument in opposition to the County's motion for summary judgment on this issue.

circumstances", that "a municipality may be found liable under § 1983 even in the absence of individual liability."  *Barrett v. Orange County Human Rights Comm'n*, 194 F.3d 341, 350 (2d Cir.1999).  "The rule [ ] articulated in *Barrett* applies where "the combined acts or omissions of several employees acting under a governmental policy or custom may violate those rights."  *Rutigliano v. City of New York*, 326 F. App'x 5, 9 (2d Cir. 2009) (internal quotation marks omitted).

Here, plaintiff has not alleged any such "combined acts or omissions of several employees acting under a governmental policy or custom."  Plaintiff's claim against the County is directly derived from Smolinsky's alleged wrongdoing.  *See Graham v. City of New York*, 2011 WL 3625074, at *14 (E.D.N.Y. 2011) ("[b]ecause there is no evidence that plaintiff['s] alleged injuries are attributable to anyone other than the named defendants, and because the court has found that plaintiff [ ] did not suffer any constitutional injury at the hands of any individual police officer, the court grants the defendants' motion for summary judgment on [plaintiff's] *Monell* claim.")  In this instance, "because the Court grants summary judgment as to the underlying constitutional violations, so too will it grant summary judgment on plaintiff's *Monell* claims."  *Dobryakov v. Vill. of Spring Valley Police Dep't*, 2011 WL 1080316, at *5 (S.D.N.Y. 2011).

## VII.    Supplemental Jurisdiction

In the amended complaint, in addition to her federal cause of action, plaintiff asserts several state-law causes of action for intentional and negligent infliction of emotional distress, slander, false imprisonment, negligent supervision and defamation.  District courts have supplemental jurisdiction over all state-law claims that are so related to federal claims over which they exercise original jurisdiction that they form part of the same case or controversy under Article III of the Constitution.  *See* 28 U.S.C. § 1367(a). Application of supplemental jurisdiction

is discretionary, however, and "it requires a balancing of the considerations of comity, fairness to the litigants, judicial economy, and the avoidance of needless decisions of state law." *Federman v. Empire Fire & Marine Ins. Co.*, 597 F.2d 798, 809 (2d Cir. 1979) (citation omitted).

Since the Court has granted defendants' motions for summary judgment as to all of plaintiff's federal causes of action and taking into consideration the factors listed above, the Court declines to exercise supplemental jurisdiction over plaintiff's remaining state-law causes of action and dismisses them without prejudice pursuant to 28 U.S.C. § 1367(c)(3).

## CONCLUSION

It is hereby

**ORDERED**, that all claims against defendants Broome County Sheriff's Department and David Harder are dismissed.  The Clerk is directed to terminate defendants Broome County Sheriff's Department and David Harder as parties to this action as plaintiff voluntarily discontinued all claims against said defendants; it is further

**ORDERED**, that defendant Smolinsky's motion for summary judgment and dismissal of plaintiff's claims against Smolinsky in his official capacity (Dkt. No. 30) is **GRANTED**; it is further

**ORDERED**, that defendant Benoit's motion for summary judgment and dismissal of plaintiff's Fourth Amendment claims (Dkt. No. 29) is **GRANTED**; it is further

**ORDERED**, that defendant Smolinsky's motion for summary judgment and dismissal of plaintiff's Section 1983 claims (Dkt. No. 30) is **GRANTED**; it is further

**ORDERED**, that defendant County of Broome's motion for summary judgment and dismissal of plaintiff's *Monell* claims (Dkt. No. 30) is **GRANTED**; it is further

**ORDERED**, that having dismissed plaintiffs' federal claims, the Court declines to exercise supplemental jurisdiction over pendent state law claims in the complaint in accordance with 28 U.S.C. § 1367(c)(3).  Consequently, plaintiff's state law claims are dismissed without prejudice.

The Clerk is directed to close this case.

**IT IS SO ORDERED.**

Dated:  March 23, 2012
       Albany, New York

Mae A. D'Agostino
U.S. District Judge

28